Michael A. Sirignano
Barry I. Levy
Jennifer Abreu
Vincent Pontrello
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                                     Docket No.:

                                    Plaintiffs,

                    -against-

HEALTH CHOICE PHARMACY, INC.,
AFFINITY RX, INC., D/B/A AFFINITY PHARMACY, and
ALBERT YAKUBOV,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Health Choice Pharmacy, Inc. ("Health

Choice Pharmacy"), Affinity Rx, Inc. d/b/a Affinity Pharmacy ("Affinity Rx"), and Albert

Yakubov ("Yakubov") (collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to terminate an on-going fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $5.4 million in fraudulent pharmaceutical billing to GEICO for pharmaceuticals dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims with exorbitant charges seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, including topical compounded pain creams and topical pain gels, ointments, and pain patches, primarily in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidocaine 5% Patches (collectively, the "Fraudulent Topical Pain Products"), as well as other duplicative and unnecessary medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      Defendant Yakubov is the record owner of the two pharmacy defendants, Health Choice Pharmacy and Affinity Rx (the "Pharmacies"), which he presented as separately owned, neighborhood pharmacies, when in fact, the Pharmacies were used as part of an integrated scheme to dispense millions in billing to GEICO for the Fraudulent Pharmaceuticals.  In furtherance of the scheme, Yakubov and the other Defendants entered into illegal, collusive agreements with prescribing healthcare providers (collectively, the "Prescribing Providers") and unlicensed laypersons (collectively, the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics").  Pursuant to these illegal, collusive agreements, the Defendants steered the Prescribing Providers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to the Pharmacies, in place of other effective, but much

less costly prescription and non-prescription drug products.   The Defendants targeted the Fraudulent Topical Pain Products because they were able to acquire – or with respect to the compounded pain creams, manufacture – them at low cost and then dispense and bill for them at exorbitant prices.

3.      The Defendants, in exchange for paying kickbacks or providing other financial incentives, received numerous medically unnecessary, duplicitous prescriptions from the Prescribing Providers and Clinic Controllers pursuant to predetermined protocols. These prescriptions were frequently generated using preset labels and stamps and/or pre-printed prescription forms created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers, in violation of law.

4.      The Defendants' scheme initially centered around Health Choice Pharmacy's production and dispensing of large volumes of topical compounded pain creams in set formulations (the "Fraudulent Compounded Pain Creams"), which were not approved by the United States Food and Drug Administration ("FDA"), and which were dispensed without complying with state and federal licensing requirements. The Defendants' billing through Health Choice Pharmacy for the Fraudulent Compounded Pain Creams typically ranged from $916.58 to $1,466.15 for a single tube.

5.      Thereafter, the Defendants primarily billed for specifically targeted Fraudulent Topical Pain Products through both Health Choice Pharmacy and Affinity Rx, primarily in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidocaine 5% Patches. The Defendants intentionally dispensed these targeted Fraudulent Topical Pain Products in order to financially enrich themselves through egregiously inflated charges submitted to GEICO.

6.     For example, billing from Health Choice Pharmacy typically ranged from $1,120.00 to $2,360.00 for a single tube of Diclofenac Gel 3%; from $380.93 to $762.00 for a single tube of Lidocaine 5% Ointment, with charges at times exceeding $1,000.00; and from $280.80 to $616.56 for a prescription of Lidocaine 5% Patches. Likewise, Affinity Rx typically billed from $2,264.00 to $2,360.00 for a single tube of Diclofenac Gel 3%; from $1,520.00 to $1,910.00 for a single tube of Lidocaine 5% Ointment; and from $279.00 to $952.20 for a prescription of Lidocaine 5% Patches.

7.     The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers but also posed serious risks to the patients' health as the Fraudulent Pharmaceuticals were prescribed and dispensed in predetermined fashion, without regard to genuine patient care, and without regard to proper documentation.

8.     By this action, GEICO seeks to recover more than $615,000.00 that Yakubov and the other Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of over $2,400,000.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through the Pharmacies because:

(i)     the Pharmacies billed for pharmaceutical products that were medically unnecessary, prescribed and dispensed pursuant to predetermined fraudulent protocols, and designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives;

(iii)     the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

(iv) the Defendants engaged in illegal bulk compounding by having Health Choice Pharmacy specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and

(v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

9. The Defendants fall into the following categories:

(i) The Pharmacies, Health Choice Pharmacy and Affinity Rx, are New York corporations engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which it is not entitled; and

(ii) Yakubov is the purported owner of Health Choice Pharmacy and Affinity Rx.

10. The Defendants' scheme began in 2015. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were medically unnecessary, prescribed and dispensed pursuant to predetermined fraudulent protocols, and designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive agreements in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Defendants engaged in illegal bulk compounding by having Health Choice Pharmacy specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in

violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

11.      Based on the foregoing, the Pharmacies do not now have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The charts attached hereto as Exhibits "1" – "2" set forth a sample of the fraudulent claims for the Fraudulent Pharmaceuticals that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through Health Choice Pharmacy and Affinity Rx using the United States mails. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $615,000.00.

## THE PARTIES

### I.      Plaintiffs

12.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

13.      Defendant Health Choice Pharmacy is a New York corporation, formed on or about November 4, 2014, with its principal place of business at 86-10 Roosevelt Avenue, Jackson Heights, New York.

14.     Defendant Affinity Rx is a New York corporation, formed on or about October 3, 2018, with its principal place of business at 7307 Main Street, Flushing, New York.

15.     Defendant Yakubov resides in and is a citizen of New York and is the purported owner of the Pharmacies.

16.     The Pharmacies and their owner Yakubov knowingly submitted fraudulent claims to GEICO for pharmaceuticals purportedly dispensed to GEICO Insureds and continue to seek reimbursement on unpaid fraudulent claims.

17.     Yakubov is no stranger to No-Fault fraudulent schemes. Yakubov was a named defendant in a federal No-Fault insurance fraud action commenced by GEICO captioned, Gov't Employees Ins. Co. et al. v. National Medical & Surgical Supply, Inc. et al., 1:14-cv-02641 (CBA)(VMS) (E.D.N.Y. 2014). In that matter, GEICO credibly alleged that as part of a fraudulent scheme, Yakubov and other defendants submitted fraudulent billing to GEICO for durable medical equipment ("DME") and orthotic devices. Specifically, GEICO alleged that Yakubov and others made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the billed for DME and orthotic devices, which in many instances were never dispensed to GEICO insureds.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

I.     **Overview of New York's No-Fault Laws**

22.     GEICO underwrites automobile insurance in the State of New York.

23.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

25.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative,

healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

26.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

28.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

29.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Overview of Applicable Licensing Laws

30.    Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

31.    Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

32.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

33.    Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

34.    New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

35.     New York Education Law § 6810 prohibits pharmacies from dispensing pharmaceuticals when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to New York Education Law § 6512, §6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

38.     New York Education Law § 6530(17) prohibits a licensed physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

39.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

40.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

41.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

III.     **Overview of Compounded Drug Products and Topical Pain Products**

42.     The United States Federal Food, Drugs, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

43.     The FDA strictly regulates over the counter ("OTC") and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

44.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (ii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

45.     Compounded drug products are not FDA-approved, though they may contain FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs – but only under limited circumstances. See 21 U.S.C. § 353a.

46.     In particular, pursuant to Section 503A of the FDCA, as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

47.     Unlike the FDA-approved products, consumers and prescribers cannot assume that compounded drugs were made by validated processes in properly calibrated and cleaned equipment; that the ingredients in the drug were obtained from FDA-approved sources; that

production personnel had the requisite knowledge and training; and that appropriate laboratory testing was performed to verify the compounded drug's potency, purity, and quality.

48.　　When Congress adopted 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.) (emphasis added).  As Congress stated at the time:

> "The exemptions in [this section] are limited to compounding for an *individual patient based on the medical need of such patient for the particular drug compound*. To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."

S. Rep. No. 105-43, at 67-68 (1997) (emphasis added).

49.　　The prescription of compounded drug products and ensuing billing to both private and public insurers has been the subject of state and federal investigations, litigation, and reports due to increased concerns regarding fraud.

50.　　The U.S. Department of Health & Human Services and the U.S. Postal Service have both issued reports documenting fraud concerns with compounded drugs. See High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns, HHS OIG Data Brief, OEI-16-00290 (June 2016); Worker's Compensation Compound Drug Costs, Management Advisory, Report No. HR-MA-16-003 (March 14, 2016).  Most recently, the U.S. Department of Health issued a report which noted that many pharmacies in New York State are among the most

questionable in the nation.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

51.     Further, there have been numerous criminal proceedings commenced in connection with compounded drug products.  For example:

- in January 2014, the United States Attorney for the District of New Jersey obtained a guilty plea from a pharmacist involved in the payment of kickbacks to a physician in exchange for prescriptions for compounded pain creams.  See USA v. Kleyman, 1:14-CR-598-JHR, Docket No. 1;

- in February 2016, the United States Attorney for the Northern District of Texas indicted two laypersons who conspired with physicians and pharmacies in a scheme involving producing, prescribing, and distributing compounded creams, including payment of kickbacks to prescribing physicians and insured beneficiaries. See USA v. Cesario, 3:16-CR-060-M, Docket Nos. 3, 75;

- in June 2016, the United States Attorney for the Middle District of Florida indicted a physician for a fraudulent scheme involving payment of kickbacks for the referral of patients and prescriptions for compounded creams. See USA v. Baldizzi, 8:16-CR-271-MSS-AEP, Docket No. 1;

- in August 2016, the United States Attorney for the Southern District of New York indicted members of the Genovese, Gambino, Luchese, and Bonanno crime families, whose alleged illegal activities included "causing…corrupt doctors to issue unnecessary and excessive prescriptions for expensive compound creams" billed to insurers.  See USA v. Parrello, 16 Crim. 522 (2016); and

- in 2020, the United States Attorney for the Central District of California indicted three laypersons and one physician for their involvement in a $22 million fraudulent scheme in which they paid kickbacks in exchange for large volumes of fraudulently generated prescriptions for compounded pain creams. See USA v. Bell, 8:20-CR-00018-JVS, Docket No. 1.

55.     As a result of the investigation, litigation, and scrutiny of fraudulent billing for compounded drug products, many fraudulent pharmacies moved away from billing for compounded drug products and thereafter focused on topical pain creams, most notably prescription strength diclofenac and lidocaine products.

55.     There are many over the counter topical pain medications available, but because the No-Fault Laws limit reimbursement for benefits to prescription drugs only, fraudulent pharmacies and fraudulent prescribers have focused on prescription strength topical products with exorbitant charges, prescribing and dispensing them in place of other effective, less costly pharmaceuticals.

55.     Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services issued a report which noted that diclofenac and lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

## IV.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.     Overview of the Scheme

52.     Beginning in 2015, Yakubov masterminded and implemented a fraudulent pharmacy scheme in which he used Health Choice Pharmacy to exploit patients for financial gain by billing the New York automobile industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Pharmaceuticals, including the Fraudulent Compounded Pain Creams and the Fraudulent Topical Pain Products -- purportedly dispensed to Insureds.

53.     Yakubov operated Health Choice Pharmacy at 86-10 Roosevelt Avenue, Jamaica, New York.

54.     In March of 2019, Yakubov began to simultaneously operate and submit billing through Affinity Rx, another pharmacy located at 7307 Main Street, Flushing, New York, about five miles from Health Choice Pharmacy, which he also used to exploit patients for financial gain.

55.     While Affinity Rx is no longer actively operating or dispensing pharmaceuticals,

Health Choice Pharmacy continues to operate and dispense pharmaceuticals, and both pharmacies continue their fraudulent scheme by hiring law firms to pursue collection on the voluminous billing submitted to GEICO.

56.     Yakubov presented the two pharmacies, Health Choice Pharmacy and Affinity Rx as separate, storefront neighborhood pharmacies operating in Queens, when in fact, they operated as a single large-scale fraudulent scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of other pharmaceutical products, including OTC medications readily available at a fraction of the cost.

57.     Health Choice Pharmacy and Affinity Rx have common ownership, each used the same law firm to submit its billing to GEICO, each used similar billing forms, and each billed for substantially the same pharmaceuticals.

58.     Unlike legitimate pharmacies dispensing a variety of pharmaceutical products, the Pharmacies intentionally focused on and targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

59.     Health Choice Pharmacy and Affinity Rx operated, and continue to operate, as part of the same fraudulent scheme, notwithstanding the submission of fraudulent billing under two different names and two different identification numbers, and the filing of numerous separate collection proceedings to collect the fraudulent billing submitted on behalf of these two ostensibly separate pharmacies.

60.     From August 2015 through December 2018, the Defendants' scheme primarily centered around Health Choice Pharmacy's mass production and dispensing of the Fraudulent Compounded Pain Creams, billing nearly $1 million for these compounded drug products during

this period. However, the Defendants continued to bill GEICO for Fraudulent Compounded Pain Creams until June 2019. In total, the Defendant's billed more than $1 million through Health Choice for the Fraudulent Compounded Pain Creams.

61.     Health Choice Pharmacy submitted voluminous billing for the Fraudulent Compounded Pain Creams, which were not approved by the FDA, without tailoring the medications to the individual needs of an individual patient, and without complying with requirements designed to ensure the quality, safety, and effectiveness of mass-produced drug products.

62.     Health Choice Pharmacy, in fact, produced the Fraudulent Compounded Pain Creams in bulk by assembling combinations of multiple drug ingredients with unproven effects in topical formulation in order to create exorbitantly priced products to financially enrich themselves rather than to treat or otherwise benefit the Insureds who purportedly received them.

63.     The more ingredients the Defendants included in a Fraudulent Compounded Pain Cream, the more they could inflate the charges they could submit to GEICO and other insurers as compounded drug products are billed per ingredient.

64.     The scheme by the Defendants to routinely manufacture and dispense large volumes of the Fraudulent Compounded Pain Creams pursuant to their collusive arrangements with the Prescribing Providers and Clinic Controllers egregiously inflated the charges submitted to GEICO.  For example, billing from the Defendants typically ranged from $916.58 to $1,466.15 for a single tube of a Fraudulent Compounded Pain Cream.

65.     In June of 2019, the Defendants ceased manufacturing, dispensing, and billing for the Fraudulent Compounded Pain Creams through Health Choice Pharmacy, likely due to increased scrutiny and litigation against pharmacies by federally funded healthcare programs (i.e.,

Medicaid and Medicare) and private insurers seeking to combat private insurance fraud based on the fraudulent prescription, dispensing, and billing practices associated with compounded drugs.

66.     Contemporaneously with the Defendants' cessation of the fraudulent compounding operation, they drastically increased the billing they submitted through Health Choice Pharmacy – and thereafter, also through Affinity Rx – for other specifically targeted Fraudulent Topical Pain Products, primarily in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidocaine 5% Patches.

67.     The Defendants have submitted – to GEICO alone – over $5.2 million in claims for reimbursement of the Fraudulent Topical Pain Products, which accounts for approximately 96% of the billing submitted through Health Choice Pharmacy and Affinity Rx.

68.     In keeping with the fact that the Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, as stated above, the Defendants, through Health Choice Pharmacy and Affinity Rx, overwhelmingly dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidocaine 5% Patches.

69.     The Defendants chose these topical pain products – Diclofenac Gel 3%, Lidocaine 5% Ointment, and Lidocaine 5% Patches – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC drug products that could be recommended to Insureds were not covered expenses under the No-Fault Laws.

70.     The remaining billing submitted through the Pharmacies was primarily for duplicative and unnecessary oral pain-relieving medication, including nonsteroidal anti-

inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to maximize profits and defraud GEICO, without regard to patient care.

71.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and Clinic Controllers in which the Defendants steered them to prescribe and direct large volumes of medically unnecessary prescriptions to Health Choice Pharmacy and Affinity Rx for the targeted set of Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams which were purportedly prescribed and dispensed to treat patients at the No-Fault Clinics, in exchange for the payment of kickbacks or other financial incentives.

72.     Among other things, the Defendants paid kickbacks to Clinic Controllers at No-Fault Clinics who concealed themselves as mere landlords in order to avoid detection of the Defendants' illegal scheme.

73.     For example, the Defendants – through Health Choice Pharmacy and Affinity Rx's corporate bank accounts – made payments to various entities owned and/or operated by Mikhail Kushmakov ("Kushmakov").  Kushmakov was the leaseholder of at least two No-Fault Clinics which have been the subject of previous investigations with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

74.     The No-Fault Clinics associated with Kushmakov have been the source of forged and/or altered prescriptions that were subsequently used by a pharmacy to bill GEICO for pharmaceuticals purportedly dispensed to GEICO insureds.

75.     Specifically, during a deposition in the federal litigation captioned, <u>Government Employees Insurance Company, et al. v. Custom RX Pharmacy, LLC, et al.</u>, 20-cv-02622 (CBA)

(SJB) (E.D.N.Y. 2020) (the "Custom RX litigation"), Radha Gara, M.D. ("Dr. Gara") identified several prescriptions issued in his name that were forged and/or altered to include additional pharmaceuticals that he did not prescribe to patients.  According to Dr. Gara's testimony, the front desk employees at the No-Fault Clinics located at 97-01 101st Avenue, Ozone Park, New York (the "Ozone Park Clinic") and 92-08 Jamaica Avenue, Woodhaven, New York (the "Woodhaven Clinic") were responsible for directing prescriptions to pharmacies. The forged and/or altered prescriptions identified by Dr. Gara were issued using pre-printed prescription order forms (the "Fraudulent Prescription Forms") which were thereafter submitted to GEICO in support of Custom RX's fraudulent billing.

76.     The Ozone Park Clinic and the Woodhaven Clinic also steered prescriptions to the Defendants – including Fraudulent Prescription Forms allegedly issued by Dr. Gara – that were dispensed and billed through Affinity Rx.

77.     Notably, in many instances, the Fraudulent Prescription Forms allegedly issued by Dr. Gara – and submitted to GEICO in support of Affinity Rx's billing – appear to be forged or altered. Specifically, at times, the prescription submitted by Affinity Rx was altered to include more medications than those included on the original prescription submitted to GEICO by Dr. Gara with his claim for reimbursement of the corresponding medical examination.

78.     The Defendants ensured that the Prescribing Providers and Clinic Controllers at No-Fault Clinics directed the prescriptions for the Fraudulent Pharmaceuticals to Health Choice Pharmacy and Affinity Rx, regardless of (i) the distance of the pharmacy to the Insureds' residences or the No-Fault Clinics where they purportedly receive treatment and (ii) the fact that

there were countless other pharmacies located much closer to the Insured's residences or the No-Fault Clinics.

79.     In fact, nearly 50% of the Insureds that allegedly received pharmaceuticals dispensed by Health Choice Pharmacy lived outside of Queens, New York, where the pharmacy is located, with Insureds scattered throughout Queens, Brooklyn, Bronx, Manhattan, and Long Island, including Nassau and Suffolk County.

80.     Likewise, approximately 70% of the Insureds that allegedly received pharmaceuticals dispensed by Affinity Rx lived outside of Queens, New York, where the pharmacy is located, with a majority of the Insureds' residences scattered throughout Queens, Brooklyn, Bronx, Manhattan, and Long Island, including Nassau and Suffolk County.

81.     In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by Health Choice Pharmacy or Affinity Rx lived in cities and counties outside of New York City and outside of the State of New York.

82.     In most cases, the Pharmacies either purported to deliver or mail the Fraudulent Pharmaceuticals directly to Insureds' residences or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

83.     But for the Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

84.     Instead, the Prescribing Providers and the Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies, irrespective of their inconvenient locations to the Insureds' residences or the No-Fault Clinics because the prescriptions were being issued pursuant to illegal, collusive agreements between the Defendants and the Prescribing Providers

and Clinic Controllers.

85.    The Pharmacies, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

86.    The prescriptions that the Pharmacies filled often contained preset labels or stamps with the names of some of the Fraudulent Pharmaceuticals, which the Defendants provided to the Prescribing Providers and Clinic Controllers so as to make it as convenient as possible to prescribe, or cause to be prescribed the Fraudulent Pharmaceuticals and steer those prescriptions to the Defendants.

87.    A sample of the prescriptions issued by the Prescribing Providers using preset labels or rubber stamps, which the Defendants submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "3".

88.    In some instances, the Prescribing Providers were supplied with Fraudulent Prescription Forms, which is essentially a product list of various Fraudulent Pharmaceuticals that the Affinity purportedly dispensed to Insureds.

89.    The Fraudulent Prescription Forms contain the names of predetermined Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and the quantity in which they were to be prescribed and dispensed to Insureds.

90.    Affinity filled the Fraudulent Prescription Forms despite the fact that they are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider.

91.     A sample of the prescriptions purportedly issued by the Prescribing Providers using the Fraudulent Prescription Forms, which Affinity submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "4".

92.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

93.     The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

94.     The Prescribing Providers and the Clinic Controllers would have not engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using the preset labels or stamps and Fraudulent Prescription Forms, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they

profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

**B.** **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care In Order to Exploit Patients for Financial Gain**

95.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacies – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

96.     Despite the basic goal to help patients get better in a timely manner, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

97.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

98.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by the Pharmacies were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

99.     To the extent any examination was performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

100.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

101.     The Prescribing Providers also routinely failed to document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

102.     The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacies were actually used by the patient.

103.     The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by the Pharmacies provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

104.     At times, the Defendants dispensed and billed for refills of Fraudulent Pharmaceuticals that were not authorized by the prescriptions purportedly issued by the Prescribing Providers.

105.     At other times, the Prescribing Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical, or alternatively,

documented a medication that was inconsistent with the medications purportedly dispensed by the

Pharmacies.  For example:

i. Insured RR was allegedly involved in a motor vehicle accident on November 11, 2019. Thereafter, RR sought treatment with HLB Medical, P.C. ("HLB Medical") at a No-Fault Clinic located at 615 Seneca Avenue, Ridgewood, New York, and underwent a consultation with Harold Bendelstein, M.D. ("Dr. Bendelstein") on January 14, 2020.  Dr. Bendelstein did not document any medication in the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on February 6, 2020, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Bendelstein on January 14, 2020.

ii. Insured TB was allegedly involved in a motor vehicle accident on January 29, 2020. Thereafter, TB sought treatment with 406 Medical, P.C. ("406 Medical") at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and underwent an initial examination with Jean Adrien, M.D. ("Dr. Adrien") on February 11, 2020. In the recommendations section of the examination report, Dr. Adrien *only* documented that TB take Naproxen. Yet, on April 2, 2020, Affinity Rx dispensed and billed for Naproxen <u>and</u> Lidocaine 5% Ointment pursuant to prescriptions allegedly issued by Dr. Adrien on February 11, 2020.

iii. Insured IR was allegedly involved in a motor vehicle accident on July 17, 2019. Thereafter, IR sought treatment with HLB Medical at a No-Fault Clinic located at 787 Meacham Avenue, Elmont, New York, and underwent a consultation with Dr. Bendelstein on July 25, 2019.  Dr. Bendelstein did not document any medication in the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on August 19, 2019, Affinity Rx dispensed and billed for Diclofenac Gel 3% pursuant to a Fraudulent Prescription Order Form allegedly issued by Dr. Bendelstein on July 25, 2019.

iv. Insured PS was allegedly involved in a motor vehicle accident on January 1, 2020. Thereafter, PS sought treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and underwent an initial examination with Dr. Adrien on January 7, 2020.   In the recommendations section of the examination report, Dr. Adrien *only* documented that PS take Motrin and Flexeril (Cyclobenzaprine). Yet, on January 23, 2020, Affinity Rx dispensed and billed for Ibuprofen, Cyclobenzaprine, <u>and</u> Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Adrien on January 7, 2020. Further, on February 23, 2020 and March 23, 2020, Affinity Rx dispensed and billed for refills of

Lidocaine 5% Ointment pursuant to the January 7, 2020 prescription allegedly issued by Dr. Adrien.

v.      Insured DT was allegedly involved in a motor vehicle accident on August 23, 2019. Thereafter, DT sought treatment with QR Medical Services, P.C. ("QR Medical") at a No-Fault Clinic located at 148-21 Jamaica Avenue, Jamaica, New York, and underwent a follow-up examination with Muhammed Zakaria, M.D. ("Dr. Zakaria") on October 11, 2019.  Dr. Zakaria did not document any medication in the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on November 1, 2019, Affinity Rx dispensed and billed for Lidocaine 5% Ointment and Celecoxib pursuant to a Fraudulent Prescription Form allegedly issued by Dr. Zakaria.

vi.     Insured JD was allegedly involved in a motor vehicle accident on March 5, 2019. Thereafter, JD sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and underwent an initial examination with Dr. Duroseau on March 7, 2019.  In the treatment plan section of the examination report, Dr. Duroseau *only* documented that JD take Tylenol. On April 2, 2019, Health Choice Pharmacy dispensed and billed for a compounded pain gel, Lidocaine 5% Ointment with Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019. Notably, Dr. Duroseau did not evaluate JD on or about April 1, 2019.

vii.    Insured JR was allegedly involved in a motor vehicle accident on May 4, 2019. Thereafter, JR sought treatment with Metro Pain Specialists, P.C. ("Metro Pain") at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent a follow-up examination with Suresh Paulus, D.O. ("Dr. Paulus") on February 12, 2020. Dr. Paulus did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on February 20, 2020, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on February 12, 2020.  Further, JR underwent another follow-up examination with Dr. Paulus on May 20, 2020. Again, Dr. Paulus did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on June 3, 2020, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on May 20, 2020.

viii.   Insured GA was allegedly involved in a motor vehicle accident on November 8, 2017. Thereafter, GA sought treatment with Metro Pain at a No-Fault Clinic located at 381 Sunrise Highway, Lynbrook, New York, and underwent an initial evaluation with Alford Smith, M.D.  ("Dr. Smith") on December 28, 2017.  Dr. Smith did not document any medication in the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on

January 3, 2018, Health Choice Pharmacy dispensed and billed for Diclofenac Gel 3% and Meloxicam pursuant to a prescription allegedly issued by Dr. Smith on December 28, 2017.

ix.  Insured JF was allegedly involved in a motor vehicle accident on March 8, 2019. Thereafter, JF sought treatment with YD Medical Services, P.C. ("YD Medical Services") at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and underwent an initial examination with Yvel Duroseau, M.D. ("Dr. Duroseau") on March 28, 2019. In the treatment plan section of the examination report, Dr. Duroseau *only* documented that JF take Ibuprofen and Flexeril. Yet, on April 2, 2019, Health Choice Pharmacy dispensed and billed for a compounded pain gel, Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019. Notably, Dr. Duroseau did not evaluate JF on April 1, 2019.

x.  Insured LA was allegedly involved in a motor vehicle accident on November 21, 2017. Thereafter, LA sought treatment with Metro Pain at a No-Fault Clinic located at 381 Sunrise Highway, Lynbrook, New York, and underwent an initial evaluation with Dr. Smith on December 28, 2017.  Dr. Smith did not document any medication in the examination report, thereby, indicating no medication was recommended or prescribed. Yet, on January 8, 2018, Health Choice Pharmacy dispensed and billed for Diclofenac Gel 3% and Meloxicam (Mobic) pursuant to prescriptions allegedly issued by Dr. Smith on December 28, 2017.

xi.  Insured MA was allegedly involved in a motor vehicle accident on October 18, 2017. Thereafter, MA sought treatment with Metro Pain at a No-Fault Clinic located at 381 Sunrise Highway, Lynbrook, New York, and underwent an initial evaluation with Dr. Smith on December 28, 2017.  Dr. Smith did not document any medication in the examination report, thereby, indicating no medication was recommended or prescribed. Yet, on January 5, 2018, Health Choice Pharmacy dispensed and billed for Diclofenac Gel 3%, Meloxicam (Mobic), and Cyclobenzaprine (Flexeril) pursuant to a prescription allegedly issued by Dr. Smith on December 28, 2017.

106.  In further keeping with the fact that the Defendants targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, at the initial examination, the Prescribing Providers issued nearly identical prescriptions to Insureds involved in a single motor vehicle accident, regardless of the Insured's individual circumstances or actual injuries. For example:

28

i.     On April 30, 2019, three Insureds – WJ, RD, and DC – were involved in the same automobile accident. Thereafter, WJ, RD, and DC all received treatment with Metro Pain at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York with Hong Pak, M.D. ("Dr. Pak"). WJ, RD, and DC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, WJ, RD, and DC were all issued prescriptions for Diclofenac Gel 3%, Cyclobenzaprine, and Celecoxib by Dr. Pak, which were dispensed and billed by Affinity Rx.

ii.    On June 11, 2019, three Insureds – VM, KE, and CM – were involved in the same automobile accident. Thereafter, VM, KE, and CM all received treatment with A to Z Medical Care, P.C. ("A to Z Medical") at a No-Fault Clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York with Cathy Delerme-Pagan, M.D. ("Dr. Pagan") and Henry Myint, M.D. ("Dr. Myint"). VM, KE, and CM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arraignments, after their initial examinations, VM, KE, and CM were all issued prescriptions for Lidocaine 5% Ointment, Methocarbamol, and an oral NSAID by Dr. Pagan and Dr. Myint, which were dispensed and billed by Affinity Rx.

iii.   On November 25, 2019, two Insureds – GB and LC – were involved in the same automobile accident. Thereafter, GB and LC received treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York with Dr. Adrien. GB and LC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, GB and LC were issued prescriptions for Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen by Dr. Adrien, which were dispensed and billed by Affinity Rx.

iv.   On August 16, 2019, two Insureds – AM and AM – were involved in the same automobile accident. Thereafter, AM and AM received treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York with Dr. Paulus. AM and AM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, AM and AM were issued prescriptions for Lidocaine 5% Ointment by Dr. Paulus, which were dispensed and billed by Affinity Rx.

v.    On March 12, 2019, two Insureds – JC and HA – were involved in the same automobile accident. Thereafter, JC and HA both received treatment with Gara Medical Care, P.C. ("Gara Medical") at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara. JC and HA were in

different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, JC and HA were issued prescriptions for Lidothol Patches and Diclofenac Gel 3% by Dr. Gara, which were dispensed and billed by Affinity Rx. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

vi.    On September 10, 2019, two Insureds – AR and AD – were involved in the same automobile accident. Thereafter, AR and AD received treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York with Dr. Duroseau. AR and AD were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, AR and AD were issued prescriptions for Lidocaine 5% Ointment and Diclofenac Gel 3% by Dr. Duroseau, which were dispensed and billed by Health Choice Pharmacy.

vii.    On January 14, 2019, two Insureds – NC and DC – were involved in the same automobile accident. Thereafter, NC and DC received treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York with Dr. Duroseau. NC and DC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, NC and DC were issued prescriptions for a compounded pain gel, Lidocaine 5% Ointment with Diclofenac Gel 3%, by Dr. Duroseau, which were dispensed and billed by Health Choice Pharmacy.

viii.    On August 2, 2020, two Insureds – AM and CD – were involved in the same automobile accident. Thereafter, AM and CD both received treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York with Dr. Duroseau. AM and CD were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, AM and CD were issued prescriptions for Diclofenac Gel 3% by Dr. Duroseau, which were dispensed and billed by Health Choice Pharmacy.

ix.    On November 9, 2019, two Insureds – GJ ad KC – were involved in the same automobile accident. Thereafter, GJ and KC both received treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York with Dr. Duroseau. GJ and KC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, GJ and KC were issued

prescriptions for Diclofenac Gel 3% by Dr. Duroseau, which were dispensed and billed by Health Choice Pharmacy.

x.      On March 12, 2019, two Insureds – AR and AW – were involved in the same automobile accident. Thereafter, AR and AW both received treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York with Dr. Duroseau. AR and AW were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive arrangements, after their initial examinations, AR and AW were issued prescriptions for a compounded pain gel, Lidocaine 5% Ointment with Diclofenac Gel 3%, by Dr. Duroseau, which were dispensed and billed by Health Choice Pharmacy.

107.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

108.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require the same pharmaceutical products.

109.    Even so, in keeping with the fact that the Fraudulent Pharmaceuticals were medically unnecessary and prescribed pursuant to predetermined fraudulent protocols designed to maximize profits, multiple Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals, irrespective of their individual needs.

110.    In keeping with the fact that the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols without regard for genuine patient care, in many instances, Insureds received their medications weeks after they prescribed.  For example:

i.      Insured TB was allegedly involved in a motor vehicle accident on January 29, 2020. Thereafter, TB sought treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and underwent an initial examination with Dr. Adrien on February 11, 2020. On the same date, Dr. Adrien prescribed Naproxen to Insured TB. On April 2, 2020, *51 days later*, Affinity Rx dispensed and billed for Naproxen <u>and</u> Lidocaine 5% Ointment

pursuant to prescriptions allegedly issued by Dr. Adrien on February 11, 2020. Notably, Dr. Adrien did not document the prescription of Lidocaine 5% Ointment in the recommendations section of the February 11, 2020 examination report.

ii.   Insured NS was allegedly involved in a motor vehicle accident on September 22, 2019. Thereafter, NS sought treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent an examination with Dr. Paulus on December 11, 2019.  On the same date, Dr. Paulus prescribed Lidocaine 5% Ointment to Insured NS. On January 15, 2020, *35 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on December 11, 2019.

iii.  Insured EM was allegedly involved in a motor vehicle accident on January 10, 2020. Thereafter, EM sought treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and underwent an examination with Dr. Adrien on January 16, 2020.  Dr. Adrien's treatment notes did not mention or document the prescription of any medications. Nevertheless, on February 17, 2020, *32 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Adrien on January 16, 2020.

iv.   Insured VS was allegedly involved in a motor vehicle accident on January 11, 2020. Thereafter, VS sought treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent an examination with Dr. Paulus on January 29, 2020.  On the same date, Dr. Paulus prescribed Lidocaine 5% Ointment to Insured VS. On February 26, 2020, *28 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on January 29, 2020.

v.    Insured MJ was allegedly involved in a motor vehicle accident on March 30, 2019. Thereafter, MJ sought treatment with Gara Medical at a No-Fault Clinic located at 97-01 101 Avenue, Ozone Park, New York, and underwent an examination with Dr. Gara on April 9, 2019.  On the same date, Dr. Gara prescribed Diclofenac Gel 3% to Insured MJ using a Fraudulent Prescription Form. Gara Medical submitted a copy of this prescription with its claim for reimbursement for Dr. Gara's examination. On May 3, 2019, *24 days later*, Affinity Rx dispensed and billed for Diclofenac Gel 3% and Lidocaine 5% Patches purportedly dispensed to MJ pursuant to the prescription Dr. Gara issued on April 9, 2019.  The prescription Affinity submitted to GEICO was altered from the original prescription submitted by Gara Medical to include Lidocaine 5% Patches. Copies of the original and altered prescriptions discussed herein are attached at Exhibit "5."  Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Ozone Park Clinic.

vi.   Insured DTM was allegedly involved in a motor vehicle accident on August 23, 2019. Thereafter, DTM sought treatment with QR Medical at a No-Fault Clinic located at 148-21 Jamaica Avenue, Jamaica, New York, and underwent an examination with Dr. Zakaria on October 11, 2019. Dr. Zakaria's treatment notes did not mention or document the prescription of any medications. Nevertheless, on November 1, 2019, *21 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment and Celecoxib pursuant to prescriptions allegedly issued by Dr. Zakaria on October 11, 2019.

vii.   Insured LV was allegedly involved in a motor vehicle accident on August 10, 2019. Thereafter, LV sought treatment with A to Z Medical at a No-Fault Clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York, and underwent an examination with Dr. Pagan on August 14, 2019.  On the same date, Dr. Pagan prescribed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen to Insured LV. On August 30, 2019, *16 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Pagan on August 14, 2019.

viii.   Insured RE was allegedly involved in a motor vehicle accident on April 3, 2019. Thereafter, RE sought treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent an examination with Dr. Paulus on May 29, 2019.  On the same date, Dr. Paulus prescribed Lidocaine 5% Ointment to Insured RE. On June 14, 2020*, 16 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on May 29, 2019.

ix.   Insured SC was allegedly involved in a motor vehicle accident on July 20, 2019. Thereafter, SC sought treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent an examination with Dr. Paulus on August 7, 2019. On the same date, Dr. Paulus prescribed Lidocaine 5% Ointment to Insured SC. On August 21, 2020, *14 days later,* Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Paulus on August 7, 2019.

x.   Insured SM was allegedly involved in a motor vehicle accident on March 31, 2019. Thereafter, SM sought treatment with Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York, and underwent an examination with Dr. Paulus on August 1, 2019. On the same date, Dr. Paulus prescribed Lidocaine 5% Ointment to Insured SM. On August 15, 2020, *14 days later*, Affinity Rx dispensed and billed for Lidocaine 5% Ointment pursuant to prescription allegedly issued by Dr. Paulus on August 1, 2019.

111.   In further keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care, and further described herein, the Prescribing

Providers often issued multiple prescriptions for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient, thereby, engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

112.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

113.    Notably, each year approximately 4.5 million ambulatory care visits and 100,000 deaths in the United States occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescriptions, including improper prescription practices associated with therapeutic duplication. See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

114.    The above-described practices are clearly part of the Defendants' fraudulent scheme designed to maximize profit, without any regard for genuine patient care or the risk posed to Insureds.

1.    **The Fraudulent Compounded Pain Cream Prescriptions**

115.    As part of their fraudulent, profit-driven scheme, the Defendants submitted or caused to be submitted, at least $1,000,000.00 in claims for medically unnecessary Fraudulent Compounded Pain Creams under the name of Health Choice Pharmacy.

116.    The FDA defines traditional pharmacy compounding as the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription. Traditional pharmacy compounding plays a role in providing

access to medications for patients with unique medical needs, which cannot otherwise be met with a commercially available product. State licensed pharmacies may compound specified medications when an FDA-approved drug product is not available or appropriate for a patient, including the strength or route of delivery.

117. Compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products.

118. Because compounded products are not FDA-approved, they should never be prescribed as a matter of routine therapy, and should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

119. Prior to receiving a prescription for any compounded drug product, a patient's medical records should document all other forms of FDA-approved drugs that were prescribed and failed to treat the symptom for which the compounded drug product was then prescribed, and/or the medical rationale that supports the otherwise premature prescription of a compounded drug product.

120. From 2015 through 2019, Health Choice Pharmacy dispensed the Fraudulent Compounded Pain Creams, which were not FDA-approved, in predetermined set formulations, without tailoring the medications to the individual needs of an individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

121. Health Choice Pharmacy, in order to generate profits, intentionally produced and dispensed the Fraudulent Compounded Pain Creams without regard for the absence of any proven topical efficacy of the combination of ingredients.

122.    The Defendants submitted exorbitant charges for the Fraudulent Compounded Pain Creams knowing that the topical efficacy of the products Health Choice Pharmacy produced and dispensed was unproven, and that there was a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

123.    The Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product alone would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly priced Fraudulent Compounded Pain Creams, often in addition to such commercially available products.

124.    The Defendants, solely to maximize profits, used Health Choice Pharmacy to specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, to compound and dispense specially marked, formulaic prescriptions.

125.    The Defendants then entered into collusive arrangements with the Prescribing Providers and Clinic Controllers in which they provided them with kickbacks or other financial incentives in exchange for fraudulent, illusory prescriptions for the Fraudulent Compounded Pain Creams.

126.    Notwithstanding the Defendants' attempt to conceal the scheme and present Health Choice Pharmacy as a neighborhood pharmacy, the Defendants directly violated New York State and Federal regulatory and licensing requirements that govern large-scale drug compounders, drug manufacturers and outsourcing facilities and which prohibit collusive arrangements for compounding and/or dispensing of coded or specially marked prescriptions.

127.    The Fraudulent Compounded Pain Creams produced and dispensed by Health Choice Pharmacy (i) were not medically necessary; (ii) contained a combination of ingredients

with no proven efficacy, or that produced no significant difference between the compounded drug and comparable commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were prescribed and produced in large quantities without regard for medical necessity or the regulations governing the appropriate use of compounded drug products, as part of collusive arrangements with the Prescribing Providers and Clinic Controllers.

128.    In short, the Fraudulent Compounded Pain Creams produced by Health Choice Pharmacy, and prescribed by the Prescribing Providers, served no purpose other than to exploit Insureds' No-Fault Benefits in order to financially benefit the Defendants.

**2.     Health Choice Pharmacy Specialized in Large Scale Drug Compounded Activity in Violation of New York State Law and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

129.    As stated above, in order to facilitate the prescription of the Fraudulent Compounded Pain Creams, and to steer the Prescribing Providers and Clinic Controllers to direct those prescriptions to Health Choice Pharmacy, the Defendants often provided the Prescribing Providers and Clinic Controllers with preset labels or rubber stamps which contained the names of the Fraudulent Compounded Pain Creams and the designated formulations, including the names of the particular drug ingredients and percentage concentrations of each ingredient used. The Prescribing Providers then used these preset labels or stamps on their official New York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds.

130.    For example, as shown on the Defendants' billing submissions to GEICO, Health Choice Pharmacy produced and dispensed, among others, the following predetermined, formulaic, coded Fraudulent Compounded Pain Creams:

- "**Compound 218N**" containing the following ingredients:

    - KETOPROFEN (POW)
    - LIDOCAINE (POW)

- o  BACLOFEN (POW)
- o  IBUPROFEN (POW)[1]
- o  GABAPENTIN (POW)
- o  CYCLOBENZAPRINE (POW)
- o  ETHYL DIGLYCOL LIQUID
- o  PENTRAVAN EXTERNAL CREAM

- "**Compound 220W**" containing the following ingredients:

  - LIDOCAINE (POW)
  - GABAPENTIN (POW)
  - FLURBIPROFEN (POW)
  - CYCLOBENZAPRINE (POW)
  - BACLOFEN (POW)
  - ETHYL DIGLYCOL LIQUID
  - PENTRAVAN EXTERNAL CREAM
  - 

- "**Compound 4**" containing the following ingredients:

  - IMIPRAMINE HCL
  - GABAPENTIN (POW)
  - FLURBIPROFEN (POW)
  - CYCLOBENZAPRINE (POW)
  - BACLOFEN (POW)
  - MENTHOL
  - ETHYL DIGLYCOL LIQUID
  - VERSAPRO CREAM
  - 

- "**Compound 202**" containing the following ingredients:

  - LIDOCAINE (POW)
  - KETOPROFEN (POW)
  - GABAPENTIN (POW)
  - CYCLOBENZAPRINE (POW)
  - BACLOFEN (POW)
  - ETHYL DIGLYCOL LIQUID
  - VERSAPRO CREAM

- **"Compound Rx Lidocaine 5% Oint 50 GMS/Diclofenac 3% Gel 100 GMS"**

---

[1] Compound 218N contains two NSAID's (Ketoprofen and Ibuprofen).

131.    The Defendants typically billed GEICO (i) $921.58 for a single tube of Compound 218N; (ii) $1,466.15 for a single tube of Compound 220W; (iii) $1,382.35 for a single tube of Compound 4; (iv) $999.13 for a single tube of Compound 202; and (iv) $1,565.39 for a single tube of "Compound Rx Lidocaine 5% Oint 50 GMS/Diclofenac 3% Gel 100 GMS". In addition to dispensing and billing for "Compound Rx Lidocaine 5% Oint 50 GMS/Diclofenac 3% Gel 100 GMS", the Defendants also dispensed and billed for Lidocaine 5% Ointment and Diclofenac Gel 3% as separate products.

132.    Despite the fact that, according to the FDA, traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the preset labels and stamps – created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers – indicate that the Defendants created predetermined compounded drug products and produced them in bulk.

133.    Additionally, by including both Cyclobenzaprine and Baclofen– two different muscle relaxants – in every preformulated tube of Compound 218N, Compound 220W, Compound 4, and Compound 202, the Defendants engaged in therapeutic duplication whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received these Fraudulent Compounded Pain Creams.

134.    The Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Providers to meet the unique needs of any individual patient.

135.    Further, the Defendants never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

136.    Likewise, the Prescribing Providers never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to prescribe to the Insureds who received the Fraudulent Compounded Pain Creams.

137.    For example, the Prescribing Providers never indicated that the patient had a contraindication to commercially available drug product or that the patient was failing to improve with the use of commercially available drug products, nor did they document any medication allergies or pre-existing comorbidity that may support the use of a Fraudulent Compounded Pain Cream.

138.    Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Providers, and produced by the Defendants, were never customized for individual patients.  Rather, the same Fraudulent Compounded Pain Creams were repeatedly prescribed and dispensed to Insureds in bulk.

139.    Health Choice Pharmacy, by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that engaged in by drug manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

140.    In the almost four years that Health Choice Pharmacy illegally operated as a drug manufacturer of compounded pain creams, it billed GEICO alone at least $1,000,000.00 for the Fraudulent Compounded Pain Creams it created, produced, and dispensed pursuant to the duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers.

141.    GEICO makes up only a fraction of the New York automobile insurance market, and therefore, Health Choice Pharmacy likely billed all New York automobile insurers more than three times the amount billed to GEICO.

142.    Accordingly, between August 2015 and May 2019, Health Choice Pharmacy likely produced and dispensed massive volumes of the Fraudulent Compounded Pain Creams to patients resulting in millions of dollars in claims submitted to various insurers.

143.    The Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders Health Choice Pharmacy in violation of both state and federal licensing laws regulating the safe manufacturing of drugs. See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

144.    Furthermore, by acting akin to drug manufacturers and dispensers, the Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary with respect to that drug.

145.    A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

146.    Health Choice Pharmacy's Fraudulent Compounded Pain Creams were never FDA-approved and, therefore, were never verified by the FDA as being safe, effective, or quality products.  In fact, Health Choice Pharmacy's bulk compounding and dispensing of the Fraudulent Compounded Pain Creams exposed Insureds to widespread risks including therapeutic duplication and harmful contraindications, which is why they should only be prescribed under limited and unique circumstances.

### 3. The Prescription and Dispensation of Health Choice Pharmacy's Fraudulent Compounded Pain Creams Was Contrary to Evidenced-Based Medical Practices

147.    In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, Health Choice Pharmacy's Fraudulent Compounded Pain Creams (i) have no medical efficacy based on the purported symptoms of the patients receiving the compounded products, and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported – when there are many other widely accepted, proven effective alternatives with well-documented therapeutic benefits commercially available at considerably lower costs.

148.    Topical compounded pain creams should be the last prescribed intervention, after oral medications are not tolerated or are deemed ineffective or contraindicated, as well as after any FDA-approved manufactured topical products have been shown to provide no pain relief to the patient.

149.    For a topical formulation to be effective, it must first penetrate the skin.  In general, creams are less effective than gels or sprays.

150.    The skin is composed of three layers: epidermis, dermis, and hypodermis.  Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier to drug entry.  For analgesic medicines to be absorbed through the skin, they must contain optimal drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption.

151.    For a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

152.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease or congestive heart failure).

153.    Health Choice Pharmacy's Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming the Insureds actually suffered from such injuries.

154.    There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

155.    Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations for a fraction of the cost.

156.    The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations, have proven to therapeutically benefit patients suffering from pain, are FDA-approved, and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

157.    The Prescribing Providers failed to recommend that the Insureds first try OTC or prescription FDA-approved topical medications and to assess their effectiveness, prior to

prescribing one of the Fraudulent Compounded Pain Creams mass produced and dispensed by the Defendants.

158.    The Prescribing Providers also continuously failed to document in their examination reports whether the patients were intolerant of commercially available products, or whether any commercially available products were recommended to the patient but failed.

159.    The Prescribing Providers also continuously failed to document in their examination reports why any compounded drug product was medically necessary, or why the Fraudulent Compounded Pain Cream they ultimately prescribed for the patient was medically necessary.

160.    Contrary to evidenced-based medical practices, in exchange for kickbacks or other financial incentives, the Prescribing Providers routinely prescribed the Fraudulent Compounded Pain Creams without regard to whether other forms of oral and/or topical medications approved for the treatment of pain failed, or whether there was a contraindication for their use.

161.    The Prescribing Providers failed to practice evidence-based medicine.  Rather, the Prescribing Providers prescribed the Fraudulent Compounded Pain Creams based on their illegal, collusive arrangements with the Defendants who employed a fraudulent, predetermined treatment and billing protocol designed to financially exploit Insureds by causing the Prescribing Providers and Clinic Controllers to steer prescriptions for the Fraudulent Compounded Pain Creams to Health Choice Pharmacy in exchange for kickbacks or other financial incentives.

162.    As a result of these collusive arrangements, the Defendants frequently purported to dispense – through Health Choice Pharmacy – preformulated Fraudulent Compounded Pain Creams pursuant to prescriptions from the Prescribing Providers that were not individualized or tailored to meet the patient's specific individual needs. These prescriptions were often issued upon

initial examination, without indication that any other forms of oral or topical medications failed or were contraindicated. For example:

i.    Insured NJ was allegedly involved in a motor vehicle accident on August 24, 2016. NJ sought treatment at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and on September 6, 2016, underwent an initial examination with Denny Rodriguez, M.D. ("Dr. Rodriguez") of Ralph Ave Medical, P.C. ("Ralph Ave Medical"). At the time of the initial examination, Dr. Rodriguez did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on September 19, 2016, Health Choice Pharmacy dispensed and billed for a preformulated Fraudulent Compounded Pain Cream – Compound 4 – pursuant to a prescription allegedly issued by Dr. Rodriguez upon initial examination on September 6, 2016.

ii.    Insured DR was allegedly involved in a motor vehicle accident on February 26, 2016. DR sought treatment at a No-Fault Clinic located at 90-46 Corona Avenue, Forest Hills, New York, and on March 2, 2016, underwent an initial examination with James Harold, M.D. ("Dr. Harold") of Life Circles Healthcare Medical, P.C. ("Life Circles Healthcare"). At the time of the initial examination, Dr. Harold did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on March 4, 2016, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 218N – pursuant to a prescription allegedly issued by Dr. Harold upon initial examination on March 2, 2016.

iii.    Insured JP was allegedly involved in the same motor vehicle accident as DR, supra, on February 26, 2016. JP sought treatment at a No-Fault Clinic located at 90-46 Corona Avenue, Forest Hills, New York, and on March 2, 2016, underwent an initial examination with Dr. Harold of Life Circles Healthcare. At the time of the initial examination, Dr. Harold did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on March 4, 2016, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 218N – pursuant to a prescription allegedly issued by Dr. Harold upon initial examination on March 2, 2016.

iv.    Insured CM was allegedly involved in a motor vehicle accident on September 22, 2017. CM sought treatment at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and on October 19, 2017, underwent an initial examination with Dr. Duroseau. At the time of the initial examination, Dr.

Duroseau did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on October 23, 2017, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 202 – pursuant to a prescription allegedly issued by Dr. Duroseau upon initial examination on October 19, 2017.

v.   Insured LE was allegedly involved in a motor vehicle accident on January 7, 2018.  LE sought treatment at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and on January 11, 2018, underwent an initial examination with Dr. Duroseau. At the time of the initial examination, Dr. Duroseau did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on January 25, 2018, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 202 – pursuant to a prescription allegedly issued by Dr. Duroseau on January 17, 2018.

vi.   Insured OF was allegedly involved in a motor vehicle accident on August 25, 2015.  OF sought treatment at a No-Fault Clinic located at 1655 Richmond Avenue, Staten Island, New York, and on August 28, 2015, underwent an initial examination with Jean-Pierre Barakat, M.D. ("Dr. Barakat") of Richmond Medical Care, P.C. ("Richmond Medical"). At the time of the initial examination, Dr. Barakat did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on September 8, 2015, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 218N – pursuant to a prescription issued by Dr. Barakat upon initial examination on August 28, 2015.

vii.   Insured SH was allegedly involved in a motor vehicle accident on August 6, 2016.  SH sought treatment at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York, and on August 9, 2016, underwent an examination with Dr. Rodriguez. At the time of the examination, Dr. Rodriguez did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain.  Nevertheless, on September 19, 2016, *one month later,* Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 4 – pursuant to a prescription allegedly issued by Dr. Rodriguez upon initial examination on August 9, 2016.

viii.   Insured MP was allegedly involved in a motor vehicle accident on July 28, 2016.  MP sought treatment at a No-Fault Clinic located at 2379 Ralph Avenue,

Brooklyn, New York, and on August 2, 2016, underwent an initial examination with Dr. Rodriguez. At the time of the initial examination, Dr. Rodriguez did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on August 17, 2016, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 4 – pursuant to a prescription allegedly issued by Dr. Rodriguez upon initial examination on August 2, 2016.

ix. Insured NP was allegedly involved in a motor vehicle accident on April 16, 2016. NP sought treatment at a No-Fault Clinic located at 90-46 Corona Avenue, Forest Hills, New York, and on April 20, 2016, underwent an initial examination with Dr. Harold of Life Circles Healthcare. At the time of the initial examination, Dr. Harold did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on April 28, 2016, Health Choice Pharmacy dispensed and billed for a pre-formulated Fraudulent Compounded Pain Cream – Compound 218N – pursuant to a prescription allegedly issued by Dr. Harold upon initial examination on April 20, 2016.

x. Insured CB was allegedly involved in a motor vehicle accident on August 18, 2015. CB sought treatment at a No-Fault Clinic located at 1655 Richmond Avenue, Staten Island, New York, and on August 18, 2015, underwent an initial examination with Dr. Barakat of Richmond Medical. At the time of the initial examination, Dr. Barakat did not document that the Insured had a legitimate need for a uniquely tailored compounded medication nor that any other forms of oral and/or topical medications failed in the treatment of the reported pain. Nevertheless, on August 28, 2015, Health Choice Pharmacy dispensed and billed for a Fraudulent Compounded Pain Cream – Compound 218N – pursuant to a prescription allegedly issued by Dr. Barakat upon initial examination on August 18, 2015.

163.   The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream prescribed to a particular patient was actually used by the patient.

164.   The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

165.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Compounded Pain Cream or documented a different Fraudulent Compounded Pain Cream than what was actually prescribed to the patient, and dispensed and billed by the Defendants.

166.    The Prescribing Providers plainly and continuously failed to prescribe individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available FDA-approved product.

167.    Likewise, Health Choice Pharmacy plainly and continuously failed to dispense individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product.

168.    The combination of drugs used in the Fraudulent Compounded Pain Creams was merely a means for the Defendants to inflate their billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.  As a result, the more drug ingredients that Health Choice Pharmacy included in its Fraudulent Compounded Pain Creams, the more the Defendants could bill under the name of Health Choice Pharmacy.

169.    Further, pursuant to collusive arrangements and predetermined protocols, Prescribing Providers prescribed, and the Defendants dispensed additional Fraudulent Compounded Pain Creams i.e., "Compound Rx Lidocaine 5% Oint 50 GMS/Diclofenac 3% Gel 100 GMS" using preset labels or stamps and directed the prescriptions to Health Choice Pharmacy. For example:

i.     Insured LE was allegedly involved in a motor vehicle accident on January 7, 2018. Thereafter, LE sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York. On February 22, 2018, LE underwent a follow-up examination with Dr. Duroseau who recommend the Insured receive "Compound Rx". On April 2, 2018, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on March 12, 2018, even though he did not examine the Insured on that date.

ii.    Insured CT was allegedly involved in a motor vehicle accident on November 26, 2017. Thereafter, CT sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York. On March 8, 2018, CT underwent a follow-up examination with Dr. Duroseau who recommend the Insured receive "Flexeril, Compound Rx, and Ibuprofen". On March 29, 2018, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on March 22, 2018, even though he did not examine the Insured on that date.

iii.   Insured TJ was allegedly involved in a motor vehicle accident on March 10, 2019. Thereafter, on March 14, 2019, TJ sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "OTC PRN". On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

iv.    Insured TW was allegedly involved in the same motor vehicle accident as TJ, supra, on March 10, 2019. Thereafter, on March 14, 2019, TW sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "Flexeril, Tylenol, OTC". On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

v.     Insured AR was allegedly involved in a motor vehicle accident on March 12, 2019. Thereafter, on March 29, 2019, AR sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau.  Dr. Duroseau did not document any medication in the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a

prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

vi.     Insured AW was allegedly involved in the same motor vehicle accident as AR, supra, on March 12, 2019. Thereafter, on March 29, 2019, AR sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "analgesics, flexeril." On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

vii.    Insured JF was allegedly involved in a motor vehicle accident on March 8, 2019. Thereafter, on March 28, 2019, JF sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "Ibuprofen and Flexeril." On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

viii.   Insured DJ was allegedly involved in a motor vehicle accident on March 5, 2019. Thereafter, on March 7, 2019, DJ sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "OTC, Tylenol." On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

ix.     Insured IP was allegedly involved in a motor vehicle accident on February 16, 2019. Thereafter, on March 28, 2019, IP sought treatment with YD Medical Services at a No-Fault Clinic located at 2379 Ralph Avenue, Brooklyn, New York and underwent an initial examination with Dr. Duroseau who recommend the Insured receive "Tylenol, Compound Rx." On April 2, 2019, Health Choice Pharmacy dispensed and billed for Lidocaine 5% Ointment with Diclofenac Gel 3% pursuant to a prescription allegedly issued by Dr. Duroseau on April 1, 2019, even though he did not examine the Insured on that date.

170.    The Prescribing Providers and Clinic Controllers wrote, or caused to be written, the prescriptions for the Fraudulent Compounded Pain Creams and the Defendants – through Health Choice Pharmacy – filled those prescriptions pursuant to the illegal, collusive arrangements among the Defendants, Prescribing Providers, and Clinic Controllers designed to maximize profits.

4.      **The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions**

171.    Once the Defendants ceased billing for the Fraudulent Compounded Pain Creams through Health Choice Pharmacy, including its illegal operation as a manufacturer of compounded drug products, the Defendants targeted and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products, primarily in the form of Diclofenac Gel 3% and Lidocaine 5% Ointment pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

172.    Likewise, the Defendants began using Affinity Rx to dispense and bill for voluminous amounts of Fraudulent Topical Pain Products, including Diclofenac Gel 3% and Lidocaine 5% Ointment pursuant to fraudulent treatment protocols and collusive arrangements.

173.    The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Gel 3% because the Defendants could bill for this product at exorbitant charges based on egregiously high wholesale prices, which inflated the charges submitted to GEICO and other New York No-Fault insurers.

174.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

175.    The "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

176.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac

sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

177.    Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

178.    Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribing Providers and dispensed by the Defendants, is FDA approved to treat a skin condition known as actinic keratoses.

179.    Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel 3% to treat musculoskeletal injuries an accepted off-label use.

180.    Moreover, some clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

181.    The Prescribing Providers routinely prescribed and the Defendants routinely dispensed Diclofenac Gel 3% despite the fact that virtually none of the Insureds suffered from actinic keratoses.

182.    Notwithstanding the most common uses for Diclofenac Gel 3%, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe Diclofenac Gel 3%, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib (or its brand name equivalent, Celebrex), ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including, Lidocaine 5% Ointment.

183.    Prescribing Diclofenac Gel 3%, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

184.    Nevertheless, the Prescribing Providers consciously prescribed and the Defendants consciously dispensed Diclofenac Gel 3%, in conjunction with oral NSAIDs and/or Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication.

185.    By engaging in therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of Diclofenac Gel 3% in conjunction with oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

186.    In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to fraudulent predetermined protocols and without regard to genuine patient care, Prescribing Providers issued multiple prescriptions for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient (i.e., engaged in therapeutic duplication), at times, in conjunction with Fraudulent Topical Pain Products and/or muscle relaxers. For example:

      i.     Insured JS was allegedly involved in a motor vehicle accident on May 31, 2019. Thereafter, JS sought treatment with Metro Pain at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York, and underwent an initial examination with Dr. Pak on June 3, 2019. Despite the inherent risks of therapeutic duplication, Dr. Pak prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Celecoxib which were dispensed and billed by Affinity Rx on June 12, 2019.

     ii.    Insured SJ was allegedly involved in a motor vehicle accident on October 21, 2019. Thereafter, SJ sought treatment with Metro Pain at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, and underwent an initial examination with Dr. Abayev on October 30, 2019. Despite the inherent

risks of therapeutic duplication, Dr. Abayev prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Naproxen, as well as Lidocaine 5% Patches and Methocarbamol, which were dispensed and billed by Affinity Rx on November 14, 2019.

iii.    Insured KH was allegedly involved in the same motor vehicle accident as SJ, supra, on October 21, 2019. Thereafter, KH sought treatment with Metro Pain at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, and underwent a follow-up examination with Dr. Abayev on December 3, 2019. Despite the inherent risks of therapeutic duplication, Dr. Abayev prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Ibuprofen, as well as Cyclobenzaprine and Omeprazole, which were dispensed and billed by Affinity Rx on December 5, 2019.

iv.    Insured SN was allegedly involved in a motor vehicle accident on June 27, 2019. Thereafter, SN sought treatment with Midwood Metropolitan Medical, P.C. ("Midwood Metro") at a No-Fault Clinic located at 3040 Nostrand Avenue, Brooklyn, New York, and underwent a follow-up examination with Pauline Raitses, D.O. ("Dr. Raitses") on August 6, 2019. Despite the inherent risks of therapeutic duplication, Dr. Raitses prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Naproxen, which were dispensed and billed by Affinity Rx on August 27, 2019.

v.    Insured HP was allegedly involved in the same motor vehicle accident as SN, supra, on June 27, 2019. Thereafter, HP sought treatment with Midwood Metro at a No-Fault Clinic located at 3040 Nostrand Avenue, Brooklyn, New York, and underwent a follow-up examination with Dr. Raitses on August 6, 2019. Despite the inherent risks of therapeutic duplication, Dr. Raitses prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Meloxicam, which were dispensed and billed by Affinity Rx on August 27, 2019.

vi.    Insured RO was allegedly involved in a motor vehicle accident on May 19, 2019. Thereafter, RO sought treatment with MSJR of Queens, P.C.  ("MSJR") at a No-Fault Clinic located at 57-23 141st Street, Flushing, New York, and underwent an examination with Ajoy Sinha, M.D. ("Dr. Sinha") on July 17, 2019. Despite the inherent risks of therapeutic duplication, Dr. Sinha prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Meloxicam, which were dispensed and billed by Health Choice Pharmacy on July 23, 2019.

vii.    Insured NS was allegedly involved in a motor vehicle accident on March 14, 2018. Thereafter, NS sought treatment with MSJR at a No-Fault Clinic located at 57-23 141st Street, Flushing, New York, and underwent an examination with Dr. Sinha on July 17, 2019. Despite the inherent risks of therapeutic duplication, Dr. Sinha prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Meloxicam, which were dispensed and billed by Health Choice Pharmacy on July 22, 2019.

viii.   Insured CRW was allegedly involved in a motor vehicle accident on March 4, 2020. Thereafter, CRW sought treatment with PR Medical at a No-Fault Clinic located at 79-09 B Northern Boulevard, Jackson Heights, New York, and underwent an examination with Dr. Qureshi on April 28, 2020. Despite the inherent risks of therapeutic duplication, Dr. Qureshi prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Ibuprofen, which were dispensed and billed by Health Choice Pharmacy on April 30, 2020.

ix.   Insured PA was allegedly involved in a motor vehicle accident on October 17, 2017. Thereafter, PA sought treatment with Metropolitan Medical and Surgical, P.C. ("Metropolitan Medical") at a No-Fault Clinic located at 79-09 B Northern Boulevard, Jackson Heights, New York, and underwent an examination with Mary Perdue, M.D. ("Dr. Perdue") on December 15, 2017. Despite the inherent risks of therapeutic duplication, Dr. Perdue prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Meloxicam, which were dispensed and billed by Health Choice Pharmacy on December 25, 2017.

x.   Insured SBB was allegedly involved in a motor vehicle accident on July 18, 2018. Thereafter, SBB sought treatment with Michael Tamburo, D.O. P.C. ("Tamburo PC") at a No-Fault Clinic located at 381 Sunrise Highway, Lynbrook, New York, and underwent an examination with Michael Tamburo, D.O. ("Dr. Tamburo") on July 23, 2018. Despite the inherent risks of therapeutic duplication, Dr. Tamburo prescribed a topical and an oral NSAID, in the form of Diclofenac Gel 3% and Ibuprofen, which were dispensed and billed by Health Choice Pharmacy on July 26, 2018.

187.   Not only are these practices part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show a genuine disregard for – patient health and safety as they constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them.

188.   Diclofenac Gel 3% was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as OTC medications, proven to have therapeutic effects and available at a fraction of the cost.

189.   In keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the

initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

190.    In further keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

191.    Health Choice Pharmacy typically billed GEICO between $1,120.00 to $2,360.00 for a single tube of Diclofenac Gel 3%; and, to-date, has submitted over $1,841,000.00 in claims to GEICO seeking reimbursement of Diclofenac Sodium Gel 3% alone.

192.    Likewise, Affinity Rx typically billed GEICO between $2,264.00 to $2,360.00 for a single tube of Diclofenac Sodium Gel 3%, and, to-date, has submitted over $636,936.00 in claims to GEICO seeking reimbursement of Diclofenac Sodium Gel 3% alone.

193.    In addition to the egregious number of Diclofenac Gel 3% prescriptions dispensed by the Pharmacies, in accordance with the fraudulent scheme discussed above, the Pharmacies billed GEICO for exorbitantly priced Lidocaine 5% Ointment pursuant to prescriptions solicited from Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

194.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

195.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

196.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

197.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.  Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine 5% Ointment and, along with the Clinic Controllers, directed the prescriptions to the Pharmacies.

198.    For example, the Prescribing Providers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% Lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of approximately $6.99 and generally less than $10.00.

199.    As with the prescriptions for Diclofenac Gel 3%, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was

otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

200.    Indeed, in further keeping with the Defendants' fraudulent scheme, Lidocaine 5% Ointment was routinely prescribed at the time of the initial examination, *before* Insureds even had an opportunity to first try readily available, low-cost, over the counter Lidocaine products or oral pain medications. For example:

    i.    On May 1, 2019, Insured TA was allegedly involved in a motor vehicle accident. On May 2, 2019, TA underwent an initial examination at Metro Pain at a No-Fault clinic located at 2386 Jerome Avenue, Bronx, New York with Dr. Paulus who prescribed Lidocaine 5% Ointment. On May 22, 2019, Affinity Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription allegedly issued by Dr. Paulus on May 2, 2019, one day post-accident.

    ii.    On August 12, 2020, Insured DF was allegedly involved in a motor vehicle accident. On August 13, 2020, DF underwent an initial examination at NYC Medical Treatment, P.C. ("NYC Medical") at a No-Fault clinic located at 218-14 Hempstead Avenue, Queens Village, New York with Michael Jacobi, D.O. ("Dr. Jacobi") who prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine. On September 2, 2020, Affinity Rx dispensed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to this Insured pursuant to prescriptions allegedly issued by Dr. Jacobi on August 13, 2020, one day post-accident.

    iii.    On August 8, 2020, Insured RI was allegedly involved in a motor vehicle accident. On August 10, 2020, RI underwent an initial examination at Metro Pain at a No-Fault clinic located at 409 Rockaway Avenue, Brooklyn, New York with Dr. Kelly who prescribed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Lidocaine 5% Patches. On September 15, 2020, Affinity Rx dispensed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Lidocaine 5% Patches to this Insured pursuant to prescriptions allegedly issued by Dr. Kelly on August 10, 2020, two days post-accident.

    iv.    On October 22, 2019, Insured TB was allegedly involved in a motor vehicle accident. On October 25, 2019, TB underwent an initial examination at 406 Medical at a No-Fault clinic located at 1650 Eastern Parkway, Brooklyn, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment, Ibuprofen, and Methocarbamol. On November 12, 2019, Affinity Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Methocarbamol to this Insured pursuant to prescriptions allegedly issued by Dr. Pagan on October 25, 2019, three days post-accident.

v.    On October 22, 2019, Insured GM was allegedly involved in a motor vehicle accident. On October 25, 2019, GM underwent an initial examination at 406 Medical at a No-Fault clinic located at 1650 Eastern Parkway, Brooklyn, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment, Ibuprofen, and Methocarbamol. On November 13, 2019, Affinity dispensed Lidocaine 5% Ointment, Ibuprofen, and Methocarbamol to this Insured pursuant to the prescription from Dr. Pagan ordered on October 25, 2019, three days post-accident.

vi.    On January 26, 2020, Insured KY was allegedly involved in a motor vehicle accident. On January 29, 2020, KY underwent an initial examination at A to Z Medical at a No-Fault clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment. On February 13, 2020, Affinity Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription allegedly issued by Dr. Pagan ordered on January 29, 2020, three days post-accident.

vii.    On May 3, 2019, Insured MA was allegedly involved in a motor vehicle accident. On May 7, 2019, MA underwent an initial examination at A to Z Medical at a No-Fault clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen. On May 16, 2019, Affinity Rx dispensed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen to this Insured pursuant to prescriptions allegedly issued by Dr. Pagan on May 7, 2019, four days post-accident.

viii.    On August 12, 2019, Insured CS was allegedly involved in a motor vehicle accident. On August 16, 2019, CS underwent an initial examination at 406 Medical at a No-Fault clinic located at 1650 Eastern Parkway, Brooklyn, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen. On August 27, 2019, Affinity Rx dispensed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen to this Insured pursuant to prescriptions allegedly issued by Dr. Pagan on August 16, 2019, four days post-accident.

ix.    On August 12, 2019, Insured CC was allegedly involved in a motor vehicle accident. On August 16, 2019, CC underwent an initial examination at 406 Medical at a No-Fault clinic located at 1650 Eastern Parkway, Brooklyn, New York with Dr. Pagan who prescribed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen. On August 30, 2019, Affinity Rx dispensed Lidocaine 5% Ointment, Methocarbamol, and Ibuprofen to this Insured pursuant to prescriptions allegedly issued by Dr. Pagan on August 16, 2019, four days post-accident.

x.   On August 12, 2020, Insured MI was allegedly involved in a motor vehicle accident. On August 17, 2020, MI underwent an initial examination at NYC Medical at a No-Fault clinic located at 218-14 Hempstead Avenue, Queens Village, New York with Dr. Jacobi who prescribed Lidocaine 5% Ointment. On September 7, 2020, Affinity Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription allegedly issued by Dr. Jacobi on August 17, 2020, five days post-accident.

201.   In keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed pursuant to predetermined fraudulent treatment protocols and collusive arrangements, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

202.   In further keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed pursuant to predetermined fraudulent treatment protocols and collusive arrangements, the follow-up examination reports performed by the Prescribing Providers often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

203.   In keeping with the fact that the Defendants dispensed and billed for Fraudulent Pharmaceuticals pursuant to fraudulent, predetermined and profit-driven treatment protocols and collusive arrangements with the Prescribing Providers and Clinic, the Lidocaine 5% Ointment prescriptions were often issued simultaneously to, or contemporaneously to OTC medications, such as NSAIDs and muscle relaxers, and/or other Fraudulent Topical Pain Products, such as Diclofenac Gel 3%.  For example:

i.   Insured OO was allegedly involved in a motor vehicle accident on April 21, 2019. Thereafter, OO sought treatment with A to Z Medical at a No-Fault Clinic located at 92-05 Rockaway Boulevard, Ozone Park, New York, and underwent an initial examination with Dr. Pagan on May 14, 2019. Dr. Pagan prescribed Lidocaine 5% Ointment, Naproxen, and Methocarbamol, which were dispensed and billed by Affinity Rx on May 24, 2019.

ii.    Insured HF was allegedly involved in a motor vehicle accident on May 10, 2019. Thereafter, HF sought treatment with Metro Pain at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, and underwent an examination with John Greco, M.D. ("Dr. Greco") on February 20, 2020. Dr. Greco prescribed Lidocaine 5% Ointment, Lidocaine 5% Patches, Ibuprofen, and Cyclobenzaprine, which were dispensed and billed by Affinity Rx on February 26, 2020.

iii.    Insured TB was allegedly involved in a motor vehicle accident on January 29, 2020. Thereafter, TB sought treatment with 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York, and underwent an initial examination with Dr. Adrien on February 11, 2020. Dr. Adrien prescribed Lidocaine 5% Ointment and Naproxen, which were dispensed and billed by Affinity Rx on April 2, 2020.

iv.    Insured DT was allegedly involved in a motor vehicle accident on August 23, 2019. Thereafter, DT sought treatment with QR Medical at a No-Fault Clinic located at 148-21 Jamaica Avenue, Jamaica, New York, and underwent an examination with Dr. Zakaria on October 11, 2019. Dr. Zakaria prescribed Lidocaine 5% Ointment and Celecoxib, which were dispensed and billed by Affinity Rx on November 1, 2020.

v.    Insured CV was allegedly involved in a motor vehicle accident on January 30, 2019. Thereafter, CV sought treatment with Smart Choice Medical, P.C. ("Smart Choice") at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York, and underwent an initial examination with Yana Abayev, M.D. ("Dr. Abayev") on February 11, 2019. Dr. Abayev prescribed Lidocaine 5% Ointment, Diclofenac Gel 3%, and Gabapentin, which were dispensed and billed by Affinity Rx on August 14, 2020. Although these pharmaceuticals are not within the same drug class, both Diclofenac Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vi.    Insured ML was allegedly involved in a motor vehicle accident on October 27, 2017. Thereafter, ML sought treatment with Eugene J. Liu, M.D. ("Dr. Liu") at a No-Fault Clinic located at 888 Park Avenue, New York, New York, and underwent an examination with Dr. Liu on December 14, 2017. Dr. Liu prescribed Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine, which were dispensed and billed by Health Choice Pharmacy on December 15, 2017.

vii.    Insured VP was allegedly involved in a motor vehicle accident on February 10, 2017. Thereafter, VP sought treatment with LR Medical, PLLC ("LR Medical") at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York, and underwent an examination with Leonid Reyfman, M.D. ("Dr. Reyfman") on May 17, 2017. Dr. Reyfman prescribed Lidocaine 5% Ointment,

Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine, which were dispensed and billed by Health Choice Pharmacy on May 18, 2017.

viii.   Insured EB was allegedly involved in a motor vehicle accident on February 5, 2017. Thereafter, EB sought treatment with LR Medical at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York, and underwent an examination with Dr. Reyfman on May 24, 2017. Dr. Reyfman prescribed Lidocaine 5% Ointment, Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine, which were dispensed and billed by Health Choice Pharmacy on May 31, 2017.

ix.   Insured KM was allegedly involved in a motor vehicle accident on December 23, 2016. Thereafter, KM sought treatment with LR Medical at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York, and underwent an examination with Dr. Reyfman on May 15, 2017. Dr. Reyfman prescribed Lidocaine 5% Ointment, Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine which were dispensed and billed by Health Choice Pharmacy on May 31, 2017.

x.   Insured ML was allegedly involved in a motor vehicle accident on February 8, 2017. Thereafter, ML sought treatment with LR Medical at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York, and underwent an examination with Dr. Reyfman on May 15, 2017. Dr. Reyfman prescribed Lidocaine 5% Ointment, Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine, which were dispensed and billed by Health Choice Pharmacy on May 17, 2017.

204.   Affinity Rx typically billed GEICO between $1,520.00 to $1,910.00 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $1,353,400.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment alone.

205.   Likewise, Health Choice Pharmacy typically billed GEICO between $380.93 to $762.00 for a single tube of Lidocaine 5% Ointment, with charges at times exceeding $1,000.00 and, to-date, has submitted over $147,500.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

206.   The Defendants' egregious billing for Diclofenac Gel 3% and Lidocaine 5% Ointment coupled with the fact that the Prescribing Providers often failed to properly document the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds,

or for the Pharmacies to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

### ii.   The Fraudulent Pain Patches

207.   As a further part of their scheme, in some instances, the Pharmacies also billed for and dispensed exorbitantly priced pain patches – primarily in the form of Lidocaine 5%  Patches, and Lidothol 4.5-5% Patches (the "Fraudulent Pain Patches"), pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers, in exchange for kickbacks or other incentives.

208.   In keeping with the fact that the Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely dispensed and billed at exorbitant prices despite the availability of less expensive, commercially available FDA-approved patches.

209.   Defendants typically billed GEICO – through Affinity Rx – $2,235.15 for a single prescription of Lidothol 4.5-5% Patches; and between $279.00 and $952.20. for a single prescription of Lidocaine 5% Patches.

210.   Likewise, the Defendants – through Health Choice Pharmacy, dispensed and billed for Lidocaine 5% Patches at charges ranging from $280.80 and $616.56 for a single prescription of Lidocaine 5% Patches.

211.   Topical pain patches in which the primary ingredient is lidocaine (i.e., the Fraudulent Pain Patches) are mainly used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is

more attributable to its placebo effect rather than the pharmacological action of the patches themselves.

212.    While the application of pain patches with a primary ingredient of lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

213.    Nevertheless, the Prescribing Providers prescribed the Fraudulent Pain Patches that were dispensed to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

214.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers virtually never recommended Insureds first use OTC patches containing lidocaine – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers prescribed the Fraudulent Pain Patches to Insureds.

215.    Indeed, the Fraudulent Pain Patches were typically prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms and before Insureds had an opportunity to try readily available OTC medications available at a fraction of the cost. For example:

     i.    On April 4, 2019, Insured DR was allegedly involved in a motor vehicle accident. On April 9, 2019, DR underwent an initial examination at Gara Medical at a No-Fault clinic located at 92-01 101st Avenue, Ozone Park, New York with Dr. Gara who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On April 19, 2020, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Dr. Gara on April 9, 2019, five days after the accident. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Ozone Park Clinic.

     ii.    On March 12, 2019, Insured HA was allegedly involved in a motor vehicle accident. On March 18, 2019, HA underwent an initial examination at Gara

Medical at a No-Fault clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara who prescribed Lidothol Patches and Diclofenac Gel 3%. On April 1, 2020, Affinity Rx dispensed Lidothol 4.5-5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Dr. Gara on March 18, 2019, six days after the accident. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

iii.     On March 12, 2019, Insured JC was allegedly involved in a motor vehicle accident. On March 18, 2019, JC underwent an initial examination at Gara Medical at a No-Fault clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara who prescribed Lidothol Patches and Diclofenac Gel 3%. On April 1, 2020, Affinity Rx dispensed Lidothol 4.5-5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Gara on March 18, 2019, six days after the accident. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

iv.      On March 27, 2019, Insured PL was allegedly involved in a motor vehicle accident. On April 2, 2019, PL underwent an initial examination at Gara Medical at a No-Fault clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On April 9, 2020, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Dr. Gara on April 2, 2019, six days after the accident.  Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

v.       On March 27, 2019, Insured KR was allegedly involved in a motor vehicle accident. On April 2, 2019, KR underwent an initial examination at Gara Medical at a No-Fault clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On April 9, 2020, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Gara on April 2, 2019, six days after the accident. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

vi.      On March 27, 2019, Insured JR was allegedly involved in a motor vehicle accident. On April 2, 2019, JR underwent an initial examination at Gara Medical at a No-Fault clinic located at 92-08 Jamaica Avenue, Woodhaven, New York with Dr. Gara who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On April 9, 2020, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Gara on April 2, 2019, six days after the accident.  Notably, in the Custom

RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Woodhaven Clinic.

vii.   On February 19, 2020, Insured DW was allegedly involved in a motor vehicle accident. On February 27, 2020, DW underwent an initial examination at Metro Pain at a No-Fault clinic located at 409 Rockaway Avenue, Brooklyn, New York with Dr. Greco who prescribed Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen. On March 4, 2020, Affinity Rx dispensed Lidocaine 5% Patches, Lidocaine 5% Ointment, Cyclobenzaprine, and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Greco on February 27, 2020, eight days after the accident.

viii.   On October 21, 2019, Insured KH was allegedly involved in a motor vehicle accident. On October 30, 2019, KH underwent an initial examination at Metro Pain at a No-Fault clinic located at 409 Rockaway Avenue, Brooklyn, New York with Yana Dr. Abayev, M.D. ("Dr. Abayev") who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On November 12, 2019, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to prescriptions allegedly issued by Abayev on October 30, 2019, nine days after the accident.

ix.   On October 21, 2019, Insured SJ was allegedly involved in a motor vehicle accident. On October 30, 2019, SJ underwent an initial examination at Metro Pain at a No-Fault clinic located at 409 Rockaway Avenue, Brooklyn, New York with Dr. Abayev who prescribed Lidocaine 5% Patches, Diclofenac Gel 3%, Methocarbamol, and Naproxen. On November 14, 2019, Affinity Rx dispensed Lidocaine 5% Patches, Diclofenac Sodium Gel 3%, Methocarbamol, and Naproxen pursuant to the prescriptions allegedly issued by Dr. Abayev on October 30, 2019, nine days after the accident.

x.   On March 30, 2019, Insured MJ was allegedly involved in a motor vehicle accident. On April 9, 2019, MJ underwent an initial examination at Gara Medical at a No-Fault clinic located at 97-01 101st Avenue, Ozone Park, New York with Dr. Gara who prescribed Lidocaine 5% Patches and Diclofenac Gel 3%. On May 3, 2019, Affinity Rx dispensed Lidocaine 5% Patches and Diclofenac Gel 3% pursuant to a Fraudulent Prescription Form allegedly issued by Dr. Gara on April 9, 2019, nine days after the accident. Notably, in the Custom RX litigation, Dr. Gara testified that some of his prescriptions were forged and/or altered at the Ozone Park Clinic.

216.   As with the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions for the Fraudulent Pain Patches.

217.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

218.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, upon information and belief, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.

219.    Moreover, Prescribing Providers prescribed, and the Defendants dispensed, Fraudulent Pain Patches contemporaneously to other Fraudulent Pharmaceuticals.

220.    The Defendants' total billing submitted through the Pharmacies to GEICO for Fraudulent Pain Patches exceeds $151,000.00.

**C.      The Exploiting of Patients for Financial Gain Through Illegal, Collusive Arrangements Among Affinity, the Prescribing Providers, and Clinic Controllers**

221.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacies for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

222.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

223.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have

the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to the Pharmacies so that the Defendants could bill GEICO huge sums.

224. The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

225. The Defendants on occasion supplied the Prescribing Providers and the Clinic Controllers with preset labels and stamps and Fraudulent Prescription Forms to steer the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products that the Pharmacies dispensed to patients of the No-Fault Clinics and direct those prescriptions to the Pharmacies.

226. The purpose of the Defendants supplying the Prescribing Providers and Clinic Controllers with preset labels and stamps and Fraudulent Prescription Forms was so that the Prescribing Providers could repeatedly issue predetermined and/or medically unnecessary prescriptions for the exorbitantly priced Fraudulent Topical Pain Products that the Pharmacies "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

227.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

228.    The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

229.    The Prescribing Providers and the Clinic Controllers would have not engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using preset labels and stamps and Fraudulent Prescription Forms distributed by the Defendants, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

230.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to the Pharmacies.

231.     The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

232.     Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

233.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

### III.     The Fraudulent Billing the Defendants Submitted or Cause to be Submitted to GEICO

234.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

235.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

236.     The maximum amount a healthcare provider may charge for a medically necessary prescription drug or product is based upon the drug's NDC number. With respect to compounded products, the maximum a healthcare provider may charge is based on each individual ingredient included in the compounded product and their corresponding NDC numbers and AWPs.

237.   Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

238.   For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

239.   AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee.

240.   When a pharmacist bills for dispensing prescription drugs (including compounded products), it must bill based on the actual NDC number (and the assigned AWP) for that drug or compound drug ingredient.  It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

241.   The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the pre-determined, formulaic Fraudulent Compounded Pain Creams because the more ingredients contained in a compounded drug product, the more charges the Defendants may submit through Health Choice Pharmacy for dispensing the product.

242.   The Defendants produced and dispensed the Fraudulent Compounded Pain Creams – which were produced in bulk by compounding multiple drug ingredients in nonsensical

combinations with no proven efficacy – in order to inflate Health Choice Pharmacy's billing and maximize the Defendants' profits.

243.     Likewise, the Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceuticals products.

244.     The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive assigned AWP's or "list prices", in order to inflate the billing submitted through the Pharmacies so as to maximize their profits.

245.     The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

246.     In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescriptions; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; and (ii) the executed AOB assigning the Insureds' benefits to the Defendants.

247.     The Defendants never submitted their wholesale purchase invoices demonstrating: (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, including the ingredients contained in the Fraudulent Compounded Pain Creams; or (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals or the ingredients contained in the Fraudulent Compounded Pain Cream under the particular NDC numbers used in the billing, representing purchases from a particular supplier in a particular quantity.

248.    In fact, the Defendants never actually paid the "average wholesale price" of the products it dispensed or purported to dispense, and in particular never paid the targeted and egregious average wholesale price for the Fraudulent Topical Pain Products, because it is not a true representation of actual market price and is far above the actual acquisition cost of the drug products themselves.

249.    Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved and proven effective.

### IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

250.    To support the fraudulent charges, the Defendants submitted to GEICO bills and accompanying documents for No-Fault Benefits by and on behalf of the Pharmacies seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

251.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

i.      The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary, the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, and provided without regard for genuine patient care;

ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Defendants

and Clinic Controllers in order to steer voluminous and illegal prescriptions to the Pharmacies for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing laws, and therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals;

iv.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions; and

v.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering Health Choice Pharmacy ineligible to receive reimbursement for No-Fault Benefits.

## V.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

252.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

253.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

254. Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

255. The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

256. The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

257. The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

258. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Affinity Rx has ceased active operations, and the Pharmacies have been engaged in fraud.

259. The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault

arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients by numerous prescribers across numerous different clinics.

260.   GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $615,000.00 representing payments made to GEICO based upon the fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c), et al. to $1,845,000.00.

261.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
### Against Yakubov, Health Choice Pharmacy, and Affinity Rx
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

262.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

263.   There is an actual case in controversy between GEICO and the Defendants – Yakubov, Health Choice Pharmacy, and Affinity Rx – regarding approximately $2,428,269.33 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through the Pharmacies.

264.    Yakubov and the Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Pharmacies billed for Fraudulent Pharmaceuticals, which were medically unnecessary, and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care.

265.    Yakubov and the Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive agreements in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives.

266.    Yakubov and the Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

267.    Yakubov and the Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

268.    Yakubov and Health Choice Pharmacy have no right to receive payment for any pending bills submitted to GEICO through Health Choice Pharmacy for the Fraudulent Compounded Pain Creams because Health Choice Pharmacy engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain

Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault Benefits.

269.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Pharmacies have no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against Yakubov
### (Violation of RICO, 18 U.S.C. § 1962(c))

270.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

271.    Health Choice Pharmacy is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

272.    Yakubov knowingly conducted and/or participated, directly or indirectly, in the conduct of Health Choice Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges for Fraudulent Pharmaceuticals for more than two years, seeking payments that Health Choice Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Health Choice Pharmacy in exchange for unlawful kickbacks and other financial incentives;

(iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) Health Choice Pharmacy engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault Benefits; and (v) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Health Choice to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

273.    Health Choice Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Yakubov operated Health Choice Pharmacy, inasmuch as Health Choice Pharmacy was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Health Choice Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Health Choice Pharmacy to the present day.

274.    Health Choice Pharmacy is engaged in inherently unlawful inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to

financially enrich the Defendants. These inherently unlawful acts are taken by Health Choice Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

275.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $349,874.25 pursuant to the fraudulent bills submitted by the Defendants through Health Choice Pharmacy.

276.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

<u>**THE THIRD CLAIM FOR RELIEF**</u>
**Against Yakubov**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

277.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

278.     Health Choice Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

279.     Yakubov is employed by or associated with the Health Choice Pharmacy enterprise.

280.     Yakubov knowingly agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Health Choice Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Health Choice Pharmacy was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants

participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Health Choice Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) Health Choice Pharmacy engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault Benefits; and (v) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Health Choice to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

281.    Yakubov knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

282.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $349,874.25 pursuant to the fraudulent bills submitted by the Defendants through Health Choice Pharmacy.

283.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and

proper.

## THE FOURTH CLAIM FOR RELIEF
### Against Health Choice Pharmacy and Yakubov
### (Common Law Fraud)

284.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

285.    Health Choice Pharmacy and Yakubov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Health Choice Pharmacy.

286.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Health Choice  Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Health Choice Pharmacy in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that Health Choice Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; (iv) in every claim, the representation that Health Choice Pharmacy acted in accordance with materials licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Health Choice Pharmacy engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements and (v) in every claim, the representation that Health Choice Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible to receive reimbursement for No-Fault benefits.

287.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Health Choice Pharmacy that were not compensable under the No-Fault Laws.

288.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $349,874.25 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Health Choice Pharmacy.

289.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral

turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

290.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
**Against Health Choice Pharmacy and Yakubov**
**(Unjust Enrichment)**

291.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

292.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

293.    When GEICO paid the bills and charges submitted by or on behalf of Health Choice Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

294.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

295.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

296.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $349,874.25.

## THE SIXTH CLAIM FOR RELIEF
### Against Yakubov
### (Violation of RICO, 18 U.S.C. § 1962(c))

297.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

298.    Affinity Rx is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

299.    Yakubov knowingly conducted and/or participated, directly or indirectly, in the conduct of Affinity Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or caused to be submitted hundreds of fraudulent charges for Fraudulent Pharmaceuticals for nearly two years, seeking payments that Affinity Rx was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Affinity Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Affinity Rx to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

300.     Affinity Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Yakubov operated Affinity Rx, inasmuch as Affinity Rx was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Affinity Rx to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Affinity Rx to the present day.

301.     Affinity Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Affinity Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

302.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $265,470.99 pursuant to the fraudulent bills submitted by the Defendants through Affinity Rx.

303.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

## THE SEVENTH CLAIM FOR RELIEF
### Against Yakubov
### (Violation of RICO, 18 U.S.C. § 1962(d))

304.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

305.     Affinity Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

306.     Yakubov is employed by or associated with the Affinity Rx enterprise.

307.     Yakubov knowingly agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Affinity Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Affinity Rx was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Affinity Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Affinity Rx to GEICO that comprise the pattern of racketeering activity identified through

the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

308. Yakubov knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

309. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $265,470.99 pursuant to the fraudulent bills submitted by the Defendants through Affinity Rx.

310. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE EIGHTH CLAIM FOR RELIEF**
**Against Affinity Rx and Yakubov**
**(Common Law Fraud)**

311. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

312. Affinity Rx and Yakubov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Affinity Rx.

313. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the

representation that Affinity Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Affinity Rx in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that Affinity Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; and (iv) in every claim, the representation that Affinity Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible to receive reimbursement for No-Fault benefits.

314.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Affinity Rx that were not compensable under the No-Fault Laws.

315.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $265,470.99 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Affinity Rx.

316. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

317. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE NINTH CLAIM FOR RELIEF
**Against Affinity Rx and Yakubov**
**(Unjust Enrichment)**

318. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

319. As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

320. When GEICO paid the bills and charges submitted by or on behalf of Affinity Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

321. The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

322. The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

323. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $265,470.99.

## THE TENTH CLAIM FOR RELIEF
### Against Yakubov
### (Violation of RICO, 18 U.S.C. § 1962(c))

324.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

325.    Health Choice Pharmacy and Affinity Rx constitute an association-in-fact "enterprise" (the "Yakubov Pharmacy Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

326.    The members of the Yakubov Pharmacy Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Health Choice Pharmacy and Affinity Rx are ostensibly independent pharmacy entities – with different names, tax identification numbers, and addresses – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent pharmaceutical charges to GEICO and other insurers.  The Yakubov Fraud Pharmacy Enterprise has operated under separate corporate names in order to reduce the number of bills submitted under any individual name, avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one pharmacy, and to be able to continue to perpetrate the fraudulent scheme and obtain reimbursement on knowingly fraudulent pharmaceutical billing. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Yakubov Pharmacy Fraud Enterprise acting individually or without the aid of each other.

327.    The Yakubov Pharmacy Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing

overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, by facilitating payments to drivers to deliver pharmaceuticals to the patients, by facilitating  payments for patient referrals, and by retaining collection lawyers whose services were also used to generate payments from insurance companies to support all of the aforesaid functions.

328.    Yakubov is employed by and/or associated with the Yakubov Pharmacy Fraud Enterprise.

329.    Yakubov knowingly conducted and/or participated, directly or indirectly, in the conduct of the Yakubov Pharmacy Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately six years seeking payments to which the Defendants were not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were medically unnecessary, prescribed and dispensed pursuant to predetermined fraudulent protocols, and designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive agreements in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of

pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Health Choice Pharmacy and Affinity Rx dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Defendants engaged in illegal bulk compounding by having Health Choice Pharmacy specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Health Choice Pharmacy and Affinity Rx pursuant to illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" - "2".

330.    The Yakubov Pharmacy Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Yakubov operated the Yakubov Pharmacy Fraud Enterprise, inasmuch as the Pharmacies were never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Yakubov Pharmacy Fraud Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Health Choice Pharmacy and Affinity Rx to the present day.

331.    The Yakubov Pharmacy Fraud Enterprise is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by the Yakubov Pharmacy Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

332.    GEICO has been injured in its business and property by reason of the above-described conduct involving the Yakubov Pharmacy Fraud Enterprise in that GEICO has paid approximately $615,000.00 pursuant to the fraudulent bills submitted by the Defendants through Health Choice Pharmacy and Affinity Rx.

333.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

## THE ELEVENTH CLAIM FOR RELIEF
### Against Yakubov
### (Violation of RICO, 18 U.S.C. § 1962(d))

334.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

335.    Yakubov knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Yakubov Pharmacy Fraud Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO.  These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" – "2."

336.    Each member of the Yakubov Pharmacy Fraud Enterprise knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $615,000.00 pursuant to the fraudulent bills submitted by the Defendants through Health Choice Pharmacy and Affinity Rx.

337.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to approximately $2,428,269.33 submitted to GEICO through Health Choice Pharmacy and Affinity Rx;

B.    On the Second Claim For Relief against Yakubov, damages in favor of GEICO in an amount to be determined at trial but approximately $349,874.25, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Claim For Relief against Yakubov, damages in favor of GEICO in an amount to be determined at trial but approximately $349,874.25, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim For Relief against Health Choice Pharmacy and Yakubov, a recovery in favor of GEICO in an amount to be determined at trial but approximately $349,874.25, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

E.      On the Fifth Claim for Relief against Health Choice Pharmacy and Yakubov, an amount to be determined at trial but approximately $349,874.25, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Claim for Relief against Yakubov, damages in favor of GEICO in an amount to be determined at trial but approximately $265,470.99, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Claim for Relief against Yakubov, a damages in favor of GEICO in an amount to be determined at trial but approximately $265,470.99, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Claim for Relief against Affinity RX and Yakubov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $265,470.99, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

I.      On the Ninth Claim for Relief against Affinity Rx and Yakubov, an amount to be determined at trial but approximately $265,470.99, together with costs, interest, and such other and further relief as this Court deems just and proper.

J.      On the Tenth Claim For Relief against Yakubov, damages in favor of GEICO in an amount to be determined at trial but approximately $615,000.00, together with treble damages,

attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper; and

      K.     On the Eleventh Claim For Relief against Yakubov, a recovery in favor of GEICO in an amount to be determined at trial but approximately $615,000.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       May 17, 2022

                        RIVKIN RADLER LLP

                        By:   */s/ Michael A. Sirignano*
                              Michael A. Sirignano, Esq.
                              Barry I. Levy, Esq.
                              Jennifer Abreu, Esq.
                              Vincent J. Pontrello, Esq.
                      926 RXR Plaza
                      Uniondale, New York 11556
                      (516) 357-3000

                      *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

5397849.v17